UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARY PUSTELAK, et al.,

  Plaintiffs,

v.

COMERICA BANK,

  Defendant.

Case No. 25-cv-10659

Honorable Robert J. White

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION TO DISMISS

This case involves Plaintiffs' class-action claims arising from their participation in Defendant's Direct Express Debit Mastercard program, which allows recipients of federal benefits to receive and spend benefits via prepaid debit cards.[1] Plaintiffs assert claims for breach of contract, breach of fiduciary duty, statutory and common-law conversion, unjust enrichment, and violation of Michigan's Consumer Protection Act (CPA), alleging that Defendant (1) unlawfully retained interest and

---

[1] *See* Soc. Sec. Admin., *What is the Direct Express® card and how do I sign up?* (Aug. 28, 2025), https://www.ssa.gov/faqs/en/questions/KA-02429.html ("The Direct Express® card is a prepaid debit card you can use to access your benefit payment, without a bank account.  We electronically deposit your funds directly into a prepaid debit card account and the funds are available to you on your payment date.").

other investment income generated by Plaintiffs' and putative plaintiffs' funds, and (2) improperly assessed service fees on certain ATM withdrawals contrary to its promises regarding the Direct Express product. (ECF No. 11).

Before the Court is Defendant's motion to dismiss under Fed. R. Civ. P. 12(b)(6) (failure to state a claim). (ECF No. 14).  The parties fully briefed the motion, and the Court will decide it without oral argument pursuant to Local Rule 7.1(f)(2). For the following reasons, the Court grants the motion.

## I.      Background

Plaintiffs and members of the proposed class are the recipients of electronic benefit payments from the federal government. (ECF No. 11, PageID.55).  The benefits received include Social Security, disability, veterans', and other federal benefits. (ECF No. 11, PageID.55).  Plaintiffs and proposed class members collect their benefits through the "Direct Express" program (the Program) and are Direct Express account holders. (ECF No. 11, PageID.55).

The U.S. Treasury established the Program as a way to disburse federal benefit payments electronically.[2] (*See* ECF No. 11, PageID.63).  If benefit recipients choose to receive their payments through the Program, they receive a prepaid debit card known as the Direct Express Debit Mastercard (the Direct Express Card). (ECF No. 11, PageID.55, 63).  Benefit recipients do not need a bank account to sign up for the

---

[2] 31 U.S.C. § 3332 mandates that federal benefit payments be paid electronically.

Direct Express Card.   Instead, on payment day, the benefit payments are automatically deposited to the recipient's Direct Express account and accessible through the Direct Express Card.  Cardholders can use their card to make purchases and withdraw cash from ATMs. (ECF No. 11, PageID.63-65).

The government does not issue the cards, nor does it hold user accounts. Instead, as required by statute, the Direct Express Cards and associated accounts are issued and maintained by a financial institution. *See* 31 U.S.C. § 3332.  At all relevant times here, the government designated Defendant as its financial agent for the Program.  Defendant therefore issued and managed the Direct Express Cards and associated accounts, whereas the government deposited the benefit payments into the recipients' accounts with Defendant. (*See* ECF No. 11, PageID.55-56, 63-65). Each year, the government distributes billions of dollars of benefit payments to Defendant for disbursement (the Funds). (ECF No. 11, PageID.55-56).

To govern their relationship, Defendant and the government entered into a Financial Agency Agreement (the FAA). (ECF No. 14-2).  The FAA sets forth how Defendant should administer the Program. (*See generally* ECF No. 14-2).  Although Direct Express cardholders are not parties to the FAA, the FAA provides that cardholder accounts "will not accrue interest to the cardholder's benefit." (ECF No. 14-2, PageID.233).   A different agreement governs the relationship between Defendant and cardholders, referred to as the Terms of Use. (ECF Nos. 11-4, 14-3).

3

To participate in the Program, benefit recipients must agree to the Terms of Use. (ECF No. 11, PageID.63-64).  The Terms of Use defines "Card Account" as the "account held at Comerica Bank to which your Benefits are electronically transmitted by [the government] and which you access using your card." (ECF No. 14-3, PageID.270).  The definition also provides that benefit recipients "are the owner of the funds in the Card Account." (ECF No. 14-3, PageID.270). Michigan law governs the Terms of Use. (ECF No. 14-3, PageID.275).

Plaintiffs allege that the government "pays [Defendant] a fee for every Beneficiary who enrolls in" the Program. (ECF No. 11, PageID.63).  As particularly relevant here, Defendant also earns money, through interest and investment returns, on the Funds deposited by the government for distribution to benefit recipients. (ECF No. 11, PageID.56, 65-68).  That is, while the Funds are held with Defendant, but before they are withdrawn by benefit recipients, Defendant earns interest and other investment income on the Funds.  The Court will refer to the money Defendant earns on the Funds as the "Earnings."  Plaintiffs allege that the Earnings exceed $100 million per year. (ECF No. 11, PageID.67).

Plaintiffs relatedly allege that the accounts with Defendant are not "general" deposit accounts.  This means that once the Funds are deposited, they do not become available for Defendant's use as is typical of a bank's debtor-creditor relationship with its customers.  Rather, the Direct Express accounts involve "special deposits"

4

that render Defendant merely a custodian of the Funds.  And Plaintiffs allege that interest follows principal and is the property of the principal fund's owner under Michigan common law.  According to Plaintiffs, the Funds therefore belong solely to cardholders, Defendant cannot use the Funds for its own purposes, and the Earnings generated from the Funds belong to Plaintiffs. (ECF No. 11, PageID.61-62, 65-68).

Plaintiffs allege further that Defendant, in addition to illegally retaining their account Earnings, improperly assessed service fees on certain ATM withdrawals contrary to its promises regarding the Program.  Plaintiffs specifically allege that Defendant regularly charged fees for certain ATM withdrawals that should have been exempt pursuant to the Terms of Use, a "List of Fees document," and representations from www.USDirectExpress.com. (ECF No. 11, PageID.68-81).  According to Plaintiffs, "the Terms of Use, List of Fees, and [Defendant]'s descriptions of those terms, conditions, and fees at www.USDirectExpress.com collectively govern the relationship between [Defendant] and" Program participants.  Plaintiffs refer to these collectively as the "Contractual Materials." (ECF No. 11, PageID.64).

Plaintiffs' claims for breach of contract, conversion, and violation of Michigan's CPA all involve both the alleged (1) illegal retention of Earnings and (2) improperly charged ATM fees.  In contrast, the claims for breach of fiduciary duty

and unjust enrichment are exclusive to the retention of Earnings. (ECF No. 11, PageID.87-105).

## II.      Legal Standards

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Elec. Merch. Sys. LLC v. Gaal*, 58 F.4th 877, 882 (6th Cir. 2023) ("In analyzing a 12(b)(6) motion, the court must construe the complaint in the light most favorable to the plaintiff and accept all allegations as true.") (cleaned up).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).   The plausibility standard "does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct]." *Twombly*, 550 U.S. at 556.  "But a pleading must go beyond 'labels and conclusions' or a mere 'formulaic recitation of the elements of a cause of action.'" *Thompson v. Bank of Am., N.A.*, 773 F.3d 741, 750 (6th Cir. 2014) (quoting *Twombly*, 550 U.S. at 555).  Put another way, the complaint's allegations "must do more than create speculation or suspicion of a legally cognizable cause of

action; they must show entitlement to relief." *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007) (emphasis in original) (citing *Twombly*, 550 U.S. at 555-56).

Generally, the court may not consider matters outside of the pleadings in ruling on a motion to dismiss. *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 466 (6th Cir. 2014). The court may, however, consider any documents attached to the complaint, public records, or exhibits that are referred to in the complaint "and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Ath. Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008).

Importantly, the FAA between Defendant and the government, which Defendant provides with its motion, is not a public record, nor was it attached to or referred to in the amended complaint. Accordingly, with respect to whether Defendant illegally retained the Earnings from the Direct Express accounts only, the Court converts Defendant's motion to one for summary judgment under Fed. R. Civ. P. 56.[3] *See* Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.").

---

[3] Because the FAA is completely irrelevant to the second overarching issue of whether Defendant improperly charged service fees on certain ATM withdrawals, the issue can be decided on the pleadings alone, and Rule 12(b)(6) remains applicable.

As a result, Defendant's motion is, in part, a pre-discovery motion for summary judgment.   And summary judgment is generally improper before the plaintiff has a chance at discovery. *Amerisure Mut. Ins. Co. v. Transatlantic Reinsurance Co.*, No. 18-11966, 2021 WL 4340521, at *1 (E.D. Mich. Mar. 18, 2021); *see also Tucker v. Union of Needletrades, Indus. & Textile Emps.*, 407 F.3d 784, 788 (6th Cir. 2005) ("[A] motion for summary judgment may not be granted until a plaintiff has had an opportunity for discovery.").

But this rule does not require full discovery for every claim. Rather, "[b]efore ruling on summary judgment motions, a district judge must afford the parties adequate time for discovery, in light of the circumstances of the case." *Plott v. Gen. Motors Corp., Packard Elec. Div.*, 71 F.3d 1190, 1195 (6th Cir. 1995); *see also Sango v. Miniard*, No. 16-1395, 2017 WL 11768649, at *3 (6th Cir. Jan. 4, 2017) (unpublished; affirming summary judgment without further discovery when discovery was unnecessary); *Parra v. Wright*, No. 11-6270, 2013 WL 6669235, at *7 (W.D.N.Y. Dec. 18, 2013) ("[T]he facts regarding Plaintiff's efforts at exhaustion are not disputed, and it does not appear that any amount of discovery would change the outcome of that portion of the application.").

Here, no amount of discovery could alter the effect of the FAA in this case, particularly where Plaintiff does not object to consideration thereof, dispute the substance thereof, or otherwise request discovery related to this issue. The

Court therefore applies the summary judgment standards from Rule 56 and its attendant caselaw to Plaintiff's retention-of-Earnings claims.

The Court must grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A moving party must point to specific portions of the record that "it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the non-moving party may not simply rest on the pleadings but must present "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis omitted) (quoting Fed. R. Civ. P. 56(e)).

A fact is material if proof of that fact would establish or refute an essential element of the cause of action or defense. *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984). A dispute over material facts is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When it considers a summary judgment motion, the Court must view the facts and draw all reasonable inferences "in the light most favorable to the non-moving party." *60 Ivy St. Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987) (citations omitted).

### III.    Analysis

#### A.    Defendant's Retention of Account Earnings

Defendant first argues that Plaintiffs had no right to the Earnings because the agreement between it and cardholders lacks any contractual terms to that effect, the FAA explicitly prohibits paying cardholders interest, and the cardholder accounts are not special deposits.  According to Defendant, Plaintiffs' claim for breach of contract related to the retention of Earnings is therefore meritless. (ECF No. 14, PageID.189-99).  Defendant argues further that Plaintiffs' related noncontractual claims also lack merit because (1) the breach of fiduciary duty, conversion, and unjust enrichment claims all involve duties and/or subject matter covered by the parties' contractual agreement; (2) the conversion and breach of duty claims additionally fail as a matter of law; and (3) Defendant is exempt from any claim under Michigan's CPA. (ECF No. 14, PageID.205-10).

#### 1.    Breach of Contract

Plaintiffs claim that Defendant breached the Terms of Use by not paying Earnings to benefit recipients. (ECF No. 11, PageID.86-88).  As stated, Michigan law governs the Terms of Use.

"To recover for breach of contract under Michigan law, a plaintiff must allege: (1) the existence of a contract; (2) the terms of the contract; (3) that the defendant

10

breached the contract; and (4) that the breach caused the plaintiff's injury." *Derbabian v. Bank of Am., N.A.*, 587 Fed. App'x 949, 953 (6th Cir. 2014).

As an initial matter, it is undisputed that the Terms of Use is silent on the issue of interest. To circumvent the absence of an applicable contract term, Plaintiffs first emphasize that—per the Terms of Use—benefit recipients "are the owner of the funds in the Card Account." And Plaintiffs ask the Court to read an implied requirement to pay interest into the Terms of Use under a "interest follows principal" rule. Plaintiffs' logic is as follows: (1) Michigan law governs the Terms of Use; (2) Michigan common law dictates that "interest follows principal"; (3) interest must therefore follow principal under the Terms of Use; and (4) Defendant breached the Terms of Use by failing to pay the Earnings to benefit recipients who owned the Funds. (ECF No. 20, PageID.518-22).

Plaintiffs essentially rely on two cases to show that an "interest follows principal" rule must be read into the Terms of Use: *Grand Rapids Pub. Sch. v. Grand Rapids*, 146 Mich. App. 652 (1982), and *Star-Batt, Inc. v. Rochester Hills*, 251 Mich. App. 502 (2002).

In *Grand Rapids*, 146 Mich. App. 652, the Court decided whether interest earned on school tax collections belonged to the school district or the city. Prior to the lawsuit, the city would collect taxes for the district and remit them daily. *Id.* at 653. Once remitted, the district would invest the funds immediately. *Id.* The city

later changed its policy to make daily transfers of tax collections by check. *Id.* The policy shift resulted in "a delay of at least one day before the school district received the funds" and allowed the city to earn over $40,000 on short-term investments over the course of a year. *Id.* The following year, the city opted to remit checks once a week, generating over $70,000 in interest that year. *Id.*

The school district sued, arguing that any interest generated by taxes levied and collected on its behalf belonged to the district and not the city. *Id.* at 653-54. In its ruling, the Court noted that the legislature was silent on whether the city or the school was entitled to the interest. *Id.* at 656. The Court therefore relied on common-law principles to resolve the issue and found that absent "a clear statutory provision to the contrary, the general principle is that interest on public funds designated for a specific purpose follows those funds." *Id.* In so doing, the Court reasoned in part that (1) "a city or county treasurer is a fiduciary in the management and application of public funds"; (2) "[a] city and its treasurer . . . .act[] as trustees" when "collecting school funds"; and (3) "[e]arnings of a trust fund belong to the beneficiary and not the municipal official who acts as trustee or custodian." *Id.* at 657-58.

In *Star-Batt*, 251 Mich. App. 502, the city required contractors to post a cash bond in case the contractor caused damage to city property or failed to pay for certain city services. *Id.* at 503. The applicable ordinance said nothing about whether interest earned on the bond fund belonged to the city or the contractor. *Id.* at 508.

Applying the common law, the Court found that because the principal fund belonged to the contractor, so did the interest earned on the fund. *Id.* at 509-11.  The Court principally reasoned that *Grand Rapids'* "interest follows principal" rule "applies with equal strength" to "interest earned on *private* funds that remain [a] plaintiff's *private* property." *Id.* at 509 (emphasis in original); *see also id.* at 509-10 ("Interest earned on a principal fund is the property of the party owning the fund.").

The Court also stated that "as a custodian of [the] plaintiff's cash bond, the city is not entitled to a 'windfall' of interest earned on funds in which it has no ownership interest." *Id.* at 510.  The Court relatedly noted that "[a] county treasurer holding private funds is a "custodian" and "trustee" "by force of the exigencies of the situation." *Id.* at 510 n. 7.  It also distinguished another case because "the issue here is *not* whether a private party must pay interest on a loan absent an express agreement, but whether a city must pay interest earned on bonds posted for the city's protection from potential damages by a building contractor." *Id.* at 510 n. 8 (emphasis added).

*Grand Rapids* and *Star-Batt* are unavailing to support Plaintiffs' entitlement to interest here for numerous reasons.  First, to the extent both cases relied on the existence of a trust or custodial relationship governing use of the funds at issue, the Court construes this as analogous to "special" deposits in the context of a banking relationship. *See People v. Crawford*, 218 Mich. 125, 136 (1922) ("special deposit"

involves "identical money left with the bank as a bare custodian"); *Greenfield Commer. Credit v. Comerica Bank, DTE Energy Co.*, No. 260123, 2005 Mich. App. LEXIS 1513, at *5 (Mich. App. Jun. 21, 2005) (special deposits possess "trust qualities," general deposits do not); *Merrill Lynch Mortg. Capital, Inc. v. FDIC*, 293 F. Supp. 2d 98, 107 (D.D.C. 2003)[4] ("a special deposit agreement automatically creates a trust by operation of law").

Critically, Plaintiffs here cannot overcome the presumption that the Funds in this case constitute general deposits. *See Keyes v. Paducah & I. R. Co.*, 61 F.2d 611, 613 (6th Cir. 1932) ("when [deposits] are received, unless there are stipulations to the contrary, they belong to the bank, become part of its general funds, and can be loaned by it as other moneys"); *see also Merrill Lynch*, 293 F. Supp. 2d at 105 (applying New York law to rule that "deposits are presumed to be general"). This is because the "special deposit" characteristics of the cardholder accounts, as alleged and argued by Plaintiffs, are either unconvincing or undermined by the Terms of Use and the FAA.

For general deposits, the relationship between the bank and the customer is one of a debtor-creditor, and the deposit "become[s] part of [the bank's] general funds." *Keyes*, 61 F.2d at 613. A special deposit, however, "consists in the placing of specific kinds of money or property in the possession of the bank, with an

---

[4] Both Defendant and Plaintiffs cite *Merrill Lynch* in their briefs as persuasive.

14

obligation of the bank to return the identical thing deposited; the depositor retaining title." *Id.* The deposit must be "made for a special purpose and with the understanding it is to be set aside solely for that purpose and not mingled with the other funds of the bank." *Owosso Masonic Temple Ass'n v. State Sav. Bank*, 273 Mich. 682, 691 (1935); *see also Bridge v. First Nat. Bank*, 5 F. Supp. 442, 444 (E.D. Mich. 1933) ("A special deposit is one deposit made under some express or clearly implied agreement that it is made for some particular purpose . . . ."). The depositor carries the burden of proof to overcome the presumption that the deposit is general "by proving that the deposit was made upon such terms and conditions as constituted a special deposit, or a deposit for a specific purpose." *Keyes*, 61 F.2d at 613; *see also Merrill Lynch*, 293 F. Supp. 2d at 105 ("A depositor can overcome this presumption by proving the existence of an agreement, express or implied, that an account was a special deposit."). Although Plaintiffs did not deposit the Funds, they hold the customer relationship with Defendant and therefore carry the burden of proof on this issue.

Here, Plaintiffs allege that the specific nature of the deposits is established because: (1) the Terms of Use states that cardholders are the "owner of the funds in the Card Account"; (2) Defendant has unique routing and Bank Identification (BIN) numbers for the Program; (3) Defendant therefore "does not mingle the Direct Express funds with the money of other depositors in a general fund chargeable with

the payment of general deposits"; and (4) the Funds are held by Defendant "exclusively" for the special purpose of "distributing federal benefits to the Beneficiaries." (ECF No. 11, PageID.66).   And Plaintiffs argue that various provisions of the FAA further confirm the Funds' special character in this case. (ECF No. 20, PageID.523-25).  The Court, however, finds that these facts and arguments do not overcome the presumption that the Funds are general deposits.

First and foremost, since the government is the depositor and Defendant the bank, the Court finds that their intent controls. *See Borgess Hosp. v. Union Indus. Tr. & Sav. Bank of Flint*, 265 Mich. 156, 161 (1933) (designating an account as a special deposit requires "an intention on the part of both parties that it must be held and used exclusively for such purposes").  And Plaintiffs fail to establish that the government and Defendant intended the funds to be special deposits, particularly concerning the necessity that the Funds were not mingled with the other funds of the bank.

Importantly, the FAA, Terms of Use, and applicable regulations governing the Program say nothing about the Funds being separated from Defendant's other funds. *Contra Merrill Lynch*, 293 F. Supp. 2d at 106 (noting agreement included language that bank was to "'segregate and hold all funds collected and to keep the mortgage funds 'separate and apart from any of its own funds and general assets'").   In addition, unique BIN or account/routing numbers are factually insufficient to support Plaintiffs' legal conclusion.  Opening an account under a special name "in

16

and of itself" does not create special deposits.[5] *See Borgess*, 265 Mich. at 161. Unless there is a mutual understanding that the bank is to act not as a debtor but as a custodian of funds, to read a unique numerical sequence as containing some hidden meaning undisclosed by the parties is too inferential an exercise.  Further, the applicable regulations state that the accounts will receive "the same consumer protections provided to other account holders at the financial institution." 31 C.F.R. § 208.5.   So it is unclear why typical banking practices—and the assumption that the deposits are general—would not apply here.

Relatedly, the FAA and Terms of Use contain provisions that suggest the Funds are general deposits.  For example, the FAA includes a set-off right, which is typical of the "relation existing between banks and their depositors" as that of "debtor and creditor." *United States v. Butterworth-Judson Corp.*, 267 U.S. 387, 394–95 (1925).  And the FAA explicitly states that "[a]ccounts will not accrue interest to the cardholder's benefit," (ECF No. 14-2, PageID.233), which is inconsistent with the premise of special deposits.[6]   The FAA also states that

---

[5] This makes intuitive sense.  While a general checking account would also typically have specific BIN/account/routing numbers, such accounts quintessentially involve general deposits with the common understanding that banks routinely earn interest on deposited funds.

[6] Plaintiffs argue that this language is unenforceable with respect to the agreement between Defendant and cardholders because it violates Michigan's "interest follows principal" rule.  Not so.  Rather, for the reasons provided throughout this opinion, the Court declines to read such a rule into the Terms of Use and concludes that Plaintiffs' related cases are essentially inapplicable here.

"[b]enefit payments will be held in accounts eligible for FDIC deposit insurance coverage," (ECF No. 14-2, PageID.233), and the Terms of Use states that "[t]he funds are FDIC insured to the maximum amount permitted by law," (ECF No. 14-3, PageID.270).  If anyone expected Defendant to hold the Funds as a custodian and return exactly what was deposited, then FDIC insurance is unnecessary.[7]

Plaintiffs also claim that the Funds are special deposits because benefit recipients own the Funds under the Terms of Use and the FAA.  But this, without more explicit terms or evidence of intent, is not helpful to their cause; presumably, the person a bank account belongs to owns or at the very least controls the account. And Plaintiffs' related argument that Defendant had a fiduciary relationship with beneficiaries under the FAA is unsupported by the terms therein.  While the FAA generally states that that the government designates financial institutions "to provide specified services in a fiduciary capacity," (ECF No. 14-2, PageID.215), it otherwise

---

[7] To the extent Plaintiffs briefly argue that FDIC insurance rules "do not govern ownership or define the legal status of funds" under *Merrill Lynch* (ECF No. 20, PageID.525 n. 6), this is unavailing.  *Merrill Lynch*, which importantly involved "the priority of *uninsured* claims in a liquidation proceeding," merely rejected an argument that FDIC regulations preempted state law in deciding whether the funds at issue were general or special. 293 F. Supp. 2d at 104-05 (emphasis added).  The Court here does not apply any regulation to preempt state law; instead, it concludes that *the fact that accounts were insured in this case* is relevant to contractual intent under the applicable Michigan law, particularly since such insurance would be unnecessary for special deposits. *See id.* at 103 ("If a bank fails, special deposits do not become part of the receivership estate, and therefore special depositors are entitled to be paid in full before other creditors of the bank.").

makes clear that Defendant is the agent and fiduciary of the government, not individual account owners.[8]  Most importantly, mere ownership of the Funds does not establish the necessary circumstance that the Funds were not comingled with Defendant's other funds.

The same is true for the remaining FAA provisions relied on by Plaintiffs.  The FAA (1) authorizes Defendant as the government's agent "to provide electronic benefit transfer services," (ECF No. 14-2, PageID.215); (2) limits the government's reclamation of benefits once dispersed (ECF No. 14-2, PageID.231); (3) requires that Defendant return money sent to non-activated accounts (ECF No. 14-2, PageID.237); and (4) includes other, similar restrictions or prohibitions on Defendant's use of the Funds.  These provisions admittedly support that the government deposited the Funds for the specific purpose of distributing federal benefits.  But they do not show that the government did so with the understanding that the Funds be set aside *solely* for that purpose *and* not mingled with the other funds of the bank. *See Owosso*, 273 Mich. at 691.

For all these reasons, Plaintiffs fail to establish that the Funds are special deposits, i.e., that Defendant was a mere trustee or custodian of the Funds.  And

---

[8] *See, e.g.*, ECF 14-2, PageID.219 (Defendant "agrees that it owes a fiduciary duty . . . to the United States"); ECF No. 14-2, PageID.228 ("This FAA shall inure to the benefit of and be binding upon the parties to this FAA.  No other person or entity will have any right or obligation hereunder, except for successor Financial Agents accepted by Fiscal Service.").

because *Grand Rapids* and *Star-Batt* both involved such relationships, they are distinguishable from the facts here.

Moreover, it is not a matter of an ordinance or statute being silent in this case (as in *Grand Rapids* and *Star-Batt*), but a contract.  And this distinction is particularly telling given that *Star-Batt* explicitly distinguished another case where a contractual loan agreement was silent on interest payments.

Plaintiffs also present no cases where Michigan courts applied the "interest follows principal" rule to fill gaps in a contract otherwise silent as to interest payments.  Rather, Michigan courts have repeatedly declined to infer interest provisions into contractual agreements silent on the issue. *See Hanley v. Porter*, 238 Mich. 617, 622 (1927) ("No contracted indebtedness draws interest until due unless agreed upon.  Defendants drew this contract.  They easily could and should have made it plain if there was any such intent or understanding between the parties.  We cannot construe this contract as entitling defendants to the interest in issue here."); *Amluxen v. Eugene J. Stephenson, Inc.*, 340 Mich. 273, 275-76 (1954) (declining to infer requirement to pay interest into the parties' loan agreement and relying in part on authority stating that "[n]o implied contract can grow up under which interest can be recovered") (citation omitted).

Plaintiffs are correct that *Hanley*, when rejecting the defendants' claim to interest, relied in part on the fact that they drafted the contract silent on this issue.

20

Even construing the agreement here against Defendant, however, the Court declines to find any implied agreement to pay cardholders the Earnings from their accounts, particularly because the purported agreement derives from caselaw that, as discussed, is distinguishable from the circumstances here.

Ultimately, whereas courts will follow the common law if there is no statute addressing an issue, the four corners of the contract control the outcome here, and Michigan law does not allow courts to rewrite valid agreements. *See Andreson v. Progressive Marathon Ins. Co.*, 322 Mich. App. 76, 85 (2017) ("It is not the province of the judiciary to rewrite contracts to conform to the court's liking, but instead to enforce contracts as written and agreed to by the parties.") (citation omitted).  Given Plaintiffs' failure to establish that the Funds are special deposits and the inapplicability of the cases supporting their theory of entitlement to the Earnings, the Court agrees with Defendant's characterization that Plaintiffs impermissibly seek to rewrite the agreement at issue.

In sum, the Court concludes that (1) Plaintiffs fail to establish that the Funds are special deposits, (2) *Grand Rapids* and *Star-Batt* are distinguishable from and thus inapplicable to this matter, and (3) no "interest follows principal" rule can be inferred as included in the parties' agreement.  The Court therefore concludes that Plaintiffs are not entitled to the Earnings in this case.  Accordingly, Plaintiffs' claim

that Defendant breached the Terms of Use by not paying Earnings to benefit recipients must fail.

### 2. Remaining Claims

Next, because Plaintiffs are not entitled to the Earnings here, they similarly cannot sustain their noncontractual claims also based on Defendant's failure to pay interest. Accordingly, Plaintiffs' claims for conversion, breach of fiduciary duty, unjust enrichment, and violation of Michigan's CPA based on Defendant's retention of the Earnings are also without merit. The Court therefore need not address Defendant's remaining arguments to support dismissal of these claims.

### B. Defendant's ATM Fees

Concerning the remaining claims specific to the ATM fees, Defendant first argues for dismissal under the applicable limitations period. (ECF No. 14, PageID.199-202). The Court agrees that these claims are time-barred.

Statute of limitations defenses are typically not resolved at the pleading stage of litigation. *See Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012) (because the statute of limitations is an affirmative defense, a 12(b)(6) motion to dismiss "is generally an inappropriate vehicle for dismissing a claim based upon the statute of limitations"). But "[a] 12(b)(6) motion based on a statute of limitations is . . . appropriate where it is clear from the face of the complaint that relief is

timebarred." *Prepared Food Photos, Inc. v. Lakess Super Mkt., Inc.*, No. 23-100, 2023 U.S. Dist. LEXIS 233785, at *4 (W.D. Mich. Dec. 15, 2023).

Here, Plaintiffs allege that Defendant improperly charged ATM fees on the following specific dates: May 10, 2016; October 3, 2023; November 3, 2023; and March 23, 2023. (ECF No. 11, PageID.69-72, 76-79). And per the Terms of Use attached to Plaintiffs' amended complaint, "[a]n action or proceeding by [a cardholder] to enforce an obligation, duty or right arising under these Terms or applicable law with respect to [the cardholder's] Card or Card Account must be commenced within 12 months after the cause of action accrues." (ECF No. 11-4, PageID.115). Plaintiffs initially filed this action on March 7, 2025. (ECF No. 1).

According to Defendant, these circumstances clearly show from the face of the complaint that Plaintiffs' claims are untimely. Rather than contest this specific argument, Plaintiffs counter that the one-year contractual limitations period from the Terms of Use is either inapplicable to their claims or unenforceable under the circumstances. (ECF No. 20, PageID.526-33). Plaintiffs specifically argue that the provision is unenforceable because it is unreasonable and/or unconscionable.

As an initial matter, the claims at issue certainly involve efforts to enforce rights and duties arising under the Terms of Use or Michigan law with respect to Plaintiffs' accounts with Defendant. Indeed, the crux of all these claims is that Plaintiffs had a right under the parties' agreement to certain fee-free ATM

23

withdrawals from their card accounts (conversely, Defendant had a duty or obligation to waive/not charge the fees at issue).  And Plaintiffs seek to enforce their rights both under the agreement and under various provisions of Michigan law, like Michigan's CPA.

Next, in *Rory v. Cont'l Ins. Co.*, 473 Mich. 457 (2005), the Michigan Supreme Court held "that an unambiguous contractual provision providing for a shortened period of limitations is to be enforced as written unless the provision would violate law [i.e., recognized traditional contract defenses] or public policy." *Id.* at 470.  *Rory* involved an insurance policy that shortened the limitations period for claims to one year, and the Court concluded that the provision was enforceable. *Id.* at 460, 470-76, 490.  The Court also rejected the premise that adhesion contracts[9] are subject to greater judicial scrutiny than other contracts. *Id.* at 476-77, 487-90; *see also id.* at 489 ("Regardless of whether a contract is adhesive, a court may not revise or void the unambiguous language of the agreement to achieve a result that it views as fairer or more reasonable.").  The Michigan Court of Appeals later applied *Rory* to uphold the enforceability of six-month limitations period included in the plaintiffs'

---

[9] *See id.* at 490 ("The term 'adhesion contract' may . . . be used to describe a contract for goods or services offered on a take-it-or-leave-it basis."); *see also Rayford v. Am. House Roseville I, LLC*, ___ Mich. ___, No. 163989, 2025 Mich. LEXIS 1400, at *31-32 (Mich. July 31, 2025) ("An adhesion contract is defined as a standard-form contract prepared by one party, to be signed by another party in a weaker position, usu[ally] a consumer, who must essentially either accede (adhere) to the terms or not have a contract at all.") (cleaned up).

employment application. *See generally Clark v. DaimlerChrysler Corp.*, 268 Mich. App. 138 (2005).

More recently, however, the Michigan Supreme Court decided *Rayford v. Am. House Roseville I, LLC*, ___ Mich. ___, No. 163989, 2025 Mich. LEXIS 1400 (Mich. July 31, 2025).   In *Rayford*, the Court held "that an adhesive boilerplate employment agreement that shortens a limitations period must be examined for reasonableness."   *Id.* at *11.   In doing so, the Court explicitly overruled *Clark*'s extension of *Rory* "to employment agreements," and it stated that the reasonableness inquiry from two pre-*Rory* cases "provides the correct framework for reviewing contractually shortened limitations periods contained in boilerplate employment agreements."   *Id.*   The Court also stated that "[w]hile contractually shortened limitations periods are generally permitted, they require further analysis before enforcement where, as here, a non-negotiated boilerplate agreement is an adhesion contract between an employer and an employee."   *Id.*

The *Rayford* Court importantly reasoned that "*Rory*'s language purporting to reach beyond insurance contracts" was nonbinding dicta inapplicable to adhesive employment agreements, "especially" because "employment contracts . . . are radically different from insurance contracts."   *Id.* at *37-38.   And the Court stated that *Rory* "overextended itself in its attempt to dictate the enforceability of all contracts regardless of subject matter."   *Id.* at *36.   The Court relatedly rejected

25

*Clark*'s extension of *Rory* in the employment context in large part because (1) employment disputes "are wholly different" from cases involving insurance policies and (2) there are "differences between employment contracts and other areas of law." *Id.* at *33-35.

Having rejected *Rory*'s application to the employment realm, the *Rayford* Court next addressed "what analysis courts should engage in when reviewing adhesive employment contracts." *Id.* at *38-39. It stated, in relevant part:

> We hold that in these cases, the pre-*Rory* reasonableness analysis should apply. As applied to a contractually shortened limitations period, [this] reasonableness test requires
>
>> (1) that the claimant have sufficient opportunity to investigate and file an action, (2) that the time not be so short as to work a practical abrogation of the right of action, and (3) that the action not be barred before the loss or damage can be ascertained.
>
> In other words, a contractually shortened limitations period is reasonable if the party subject to it has the opportunity to try his right in the courts.
>
> This reasonableness analysis is consistent with this state's 140-year-old jurisprudence examining limitations periods for reasonableness.
>
>          *          *          *
>
> In the narrow context of adhesion contracts, we believe the common-law rule that a contract should be reviewed for reasonableness is also the better rule. . . . *Rory* was a dramatic break from [prior] precedent and from the general rule that limitations periods would be enforced only if reasonable.

Indeed, reviewing contractual provisions for reasonableness is the common rule in other jurisdictions—not the one-off, unworkable standard that the dissent makes it out to be. It also simply makes little sense to allow employers to subject employees to unreasonably short limitations periods that might, in practice, preclude statutory claims. . . . We now reestablish that reasonableness review is used for contractually shortened limitations periods in adhesive employment contracts.

In short, *Rory* completely disregarded our prior caselaw requiring that shortened limitations periods be reviewed for reasonableness, effectively overruling . . . 140 years of precedent following basic contract-formation principles. *Rory* likewise rejected [a prior employment case] despite the fact that *Rory* involved an insurance dispute. Therefore, we reject *Rory*'s extension to adhesive employment agreements. . . . Adhesion contracts with provisions shortening the statute of limitations in the employment context are subject to heightened judicial scrutiny to determine whether the provisions are reasonable.

*Id.* at *39-42 (citations omitted; cleaned up).

The Court concluded its analysis on this matter as follows: "In light of our holdings in this case, courts must now first determine whether a challenged employment agreement is adhesive and, if so, . . . determine whether a shortened limitations period is reasonable." *Id.* at *44.

Plaintiffs here argue that the contractual one-year limitations period in the Terms of Use is unreasonable under the test from *Rayford*. Defendant counters that *Rayford* is inapplicable and *Rory* still applies because *Rayford* specifically involved adhesive *employment* agreements, which the Terms of Use is not.

27

Having reviewed *Rayford* in detail, it is somewhat unclear from the majority opinion to what extent *Rory* still applies outside the insurance context.  On the one hand, *Rayford* states that "*Rory*'s language purporting to reach beyond insurance contracts constitutes nonbinding dicta," and that *Rory* "overextended itself in its attempt to dictate the enforceability of all contracts regardless of subject matter." *Id.* at *36-37.  This certainly supports that *Rory* now applies in insurance cases only, such that the pre-*Rory* reasonableness test would apply to all other adhesion contracts, not just adhesive employment agreements.  Indeed, *Rayford* at times also discusses adhesion contracts and the reasonableness test generally, without any limitation to employment contracts. *See, e.g., id.* at *40-41. ("In the narrow context of adhesion contracts, we believe the common-law rule that a contract should be reviewed for reasonableness is also the better rule.  . . . *Rory* was a dramatic break from [prior] precedent and from the general rule that limitations periods would be enforced only if reasonable.").

In contrast, *Rayford* is otherwise clear, particularly when articulating its specific holdings, that the decision, including its partial rejection of *Rory*, is specifically limited to the employment context. *See id.* at *11 ("We hold that an adhesive boilerplate *employment* agreement that shortens a limitations period must be examined for reasonableness.") (emphasis added); *id.* at *41 ("We now reestablish that reasonableness review is used for contractually shortened limitations

28

periods in adhesive *employment* contracts.") (emphasis added); *id.* at *42 ("we reject *Rory*'s extension to adhesive *employment* agreements") (emphasis added); *id.* at *44 ("courts must now first determine whether a challenged *employment* agreement is adhesive and, if so, . . . determine whether a shortened limitations period is reasonable") (emphasis added).  And much of the Court's reasoning relied on unique nature of employment agreements as opposed to other contracts generally, not only insurance agreements.

Further, Justice Cavanagh's concurrence in *Rayford* states, in relevant part:

> I agree with nearly every point in the majority opinion. I question, though, the majority's conclusion that the holdings in [*Rory*] that go beyond insurance contracts are mere dicta.  Specifically, I suspect that *Rory*'s statement that adhesion contracts "must be enforced according to [their] plain terms unless one of the traditional contract defenses applies" is properly considered a holding, not dictum.  Yet, even if that statement is a holding, I support creating a narrow carveout from *Rory*'s holding for adhesion contracts in the employment context. I consequently join the majority opinion in all other respects.

*          *          *

> Despite my minor disagreement with the majority opinion, I wholeheartedly agree with the majority's conclusion that *Rory* should not apply to adhesion contracts in the employment context.  I simply view the majority opinion as creating a narrow carveout from *Rory*'s holding on adhesion contracts for those in the employment context.

*Id.* at *54-56 (CAVANAUGH, J., concurring; citations omitted).

Absent a clearer endorsement to do so, the Court here is hesitant to apply *Rayford*, its partial rejection of *Rory*, and its reasonableness test outside the

29

employment context, especially where no court has yet addressed this issue.  Even applying this test, however, the Court concludes that the one-year contractual limitations period in this case is reasonable.

First, the Court rejects Plaintiffs' contention that the provision at issue is unreasonable solely because it falls short of the legislative limitations periods applicable to their respective claims. *See Rayford*, 2025 Mich. LEXIS 1400 at *11 ("contractually shortened limitations periods are generally permitted"); *Camelot Excavating Co. v. St. Paul Fire & Marine Ins. Co.*, 410 Mich. 118, 124-25 (1981) ("neither public policy nor existing authority prohibit private contracting parties from including . . . a provision which reasonably limits claimants to a period within which to bring suit that is shorter than the applicable state statute of limitations").

Further, the one-year period here, considering the relevant factors, did not deprive Plaintiffs the opportunity to pursue their claims in court.  Importantly, the relevant claims do not involve medical injury or similar issues that would require substantial investigation before filing suit.  Instead, the allegedly-improper ATM fees should been apparent at the time of withdrawal or, at the latest, upon receipt of the next monthly statement. (*See* ECF No. 14-3, PageID.273 (The Terms of Use states: "You should check your Card Account balance and Transaction history on a regular basis.  The information is available to you free of charge [via telephone] and at our website . . . .  For a fee, you can also receive written statements each month.")).

Under these circumstances, the Court concludes that Plaintiffs, with reasonable diligence, could have discovered the allegedly improper fees and filed suit before the one-year contractual limitations period expired. *See Camelot*, 410 Mich. at 126-28, 133-37 (shortened limitations period from six years to one year was reasonable where the plaintiff "could have discovered the existence of the bond contract and the fact that contractor Priestly had abandoned the work" in time to file suit). Stated differently, this provision offered Plaintiffs sufficient opportunity to investigate and file their claims, the time was not so short as to practically abrogate Plaintiffs' right of action, and their claims were not barred before the damage could be ascertained.

The Court also concludes that the contractual limitations period is not unconscionable. "In Michigan, unconscionability has generally been recognized to include an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." *Rayford*, 2025 Mich. LEXIS 1400 at *44-45 (cleaned up). "In other words, in order for a contract to be unconscionable, it must be [both] procedurally and substantively unconscionable." *Id.* at *45.

"Procedural unconscionability exists when a weaker party has no realistic alternative but to accept the term." *Id.* (cleaned up). Relevant factors include "the sophistication of the parties, the parties' relative market power and economic status,

31

and a party's education in a field." *Id.* at \*45-46.  "There are numerous factors that may render a contract procedurally unconscionable." *Id.* at \*46.

"Substantive unconscionability requires courts to analyze the reasonableness of the challenged term." *Id.*  "A contract provision is substantively unreasonable if the inequity shocks the conscience." *Id.* (cleaned up).

As an initial matter, Plaintiffs provide some support to establish procedural unconscionability.   This includes benefit recipient's lack of sophistication, vulnerability, and status as the weaker party, as well as Defendant's status as the exclusive administrator for the Program.  Nevertheless, for the reasons already stated, the contracted limitations period is not unreasonable and does not shock the conscience.  In other words, substantive unconscionability is absent in this case.

In sum, the one-year contractual limitations period in the Terms of Use is enforceable.  And because Plaintiffs' amended complaint affirmatively shows that Plaintiffs filed this action over a year after their ATM-fee claims accrued, these claims are dismissed as untimely.  Accordingly,

IT IS ORDERED that Defendant's motion to dismiss (ECF No. 14) is GRANTED.

33

Because all Plaintiffs' claims lack merit, IT IS FURTHER ORDERED that

Plaintiffs' amended complaint (ECF No. 11) is DISMISSED WITH PREJUDICE.


Dated: March 27, 2026                          s/ Robert J. White
                                               Robert J. White
                                               United States District Judge

33